1   Cristina C. Arguedas (CalBN 87787)
        Email: arguedas@achlaw.com
2   Raphael M. Goldman (CalBN 229261)
        Email: goldman@achlaw.com
3   ARGUEDAS, CASSMAN & HEADLEY, LLP
    803 Hearst Avenue
4   Berkeley, CA 94710
    Telephone:   (510) 845-3000
5   Facsimile:    (510) 845-3003
6
7   *Counsel for Paul S. Devine*
8
                UNITED STATES DISTRICT COURT
9
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11  UNITED STATES of AMERICA,           )   No. 10-CR-00603 (EJD)
                                        )
12                      Plaintiff,      )   **PAUL DEVINE'S SENTENCING**
                                        )   **MEMORANDUM**
13                                      )
          v.                            )
14                                      )   **[PUBLIC/REDACTED VERSION]**
                                        )
15  PAUL DEVINE,                        )
                                        )
16                      Defendant.      )
                                        )
17                                      )
                                        )
18  _____    )
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................1

II.     PERSONAL BACKGROUND .................................................................2

        A.      Childhood and Youth ....................................................................2

        B.      Education and Career ....................................................................5

        C.      Employment at Apple, Personal and Professional Struggles, and
                the Context of Mr. Devine's Crimes ............................................6

        D.      Arrest ...........................................................................................9

III.    THE OFFENSE CONDUCT ...................................................................9

        ████  ████████████████████████████████ ........................10

V.      ARGUMENT .........................................................................................11

        A.      The Sentencing Guidelines ..........................................................11

        B.      18 U.S.C. § 3553 Factors ...........................................................12

                1.      The Aberrant Nature of Mr. Devine's Misconduct...............12

                2.      Post-Offense Rehabilitation ...............................................16

                3.      Agreement to Restitution and Financial Factors..................20

                4.      Family's Dependence.........................................................21

                5.      Proportionality in Sentencing ............................................22

VI.     CONCLUSION.......................................................................................23

1

## **TABLE OF AUTHORITIES**

2

Cases

3

*Cunningham v. California*, 549 U.S. 270 (2007) ....................................12

4

5

*Gall v. United States*, 552 U.S. 38 (2007) ...........................................12

6

*Kimbrough v. United States*, 552 U.S. 85 (2007) ..............................12

7

*Pepper v. United States*, __ U.S. __, 131 S. Ct. 1229 (2011) ............................16

8

*United States v. Ghazvini et al.*, No. 12-CR-00660 CW (N.D. Cal.).....................22

9

*United States v. Kim*, 364 F.3d 1235 (11th Cir. 2004) ........................................21

10

*United States v. Menyweather*, 447 F.3d 625 (9th Cir. 2006).............................21

11

*United States v. Munoz-Camarena*, 621 F.3d 967 (9th Cir. 2010) .....................21

12

*United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) .........................................16

13

*United States v. Robertson*, 662 F.3d 871 (7th Cir. 2011).................................16

14

*United States v. Samaras*, 390 F. Supp. 2d 805 (E.D. Wis. 2005) .....................21

15

*United States v. Shy*, 538 F.3d 933 (8th Cir. 2008) ...........................................17

16

*United States v. Stall*, 81 F.3d 276 (6th Cir. 2009) ...........................................16

17

*United States v. Stewart*, No. 8:09CR282, 2011 U.S. Dist. LEXIS 89767
(D. Neb. Aug. 11, 2011) ...........................................17

18

19

20

Other Authorities

21

18 U.S.C. § 1343...........................................................................................10

22

18 U.S.C. § 1346...........................................................................................10

23

18 U.S.C. § 1349...........................................................................................10

24

18 U.S.C. § 1956...........................................................................................10

25

18 U.S.C. § 1957...........................................................................................10

26

18 U.S.C. § 3553 ............................................................... *passim*

27

28

18 U.S.C. § 3572...........................................................................................24

U.S.S.G. § 4A1.3(b)(1) ............................................................................16

1

**I.    INTRODUCTION**

2

3        Paul Shim Devine comes before the Court for sentencing having pled guilty to,

4   among other crimes, wire fraud conspiracy and money laundering.  His offenses are

5   serious, and he understands that he alone is responsible for them.  Yet Mr. Devine's

6   misconduct stands in stark contrast to the productive and unblemished life he led up

7   until the point he committed those crimes, and to the undeniable hard work he has put

8   into making amends for his wrongdoing since his arrest in 2010.  As the authors of the

9   numerous accompanying letters attest, those who are close to Mr. Devine know him to

10  be a kind, honest, respectful and generally law-abiding person.  They also attest to the

11

12  forthright manner in which Mr. Devine has confronted his own wrongdoing.

13       Indeed, to his credit, Mr. Devine has made great efforts to atone for his crimes.

14

15

16

17

18                                        He has made an unusually robust

19  endeavor to make restitution to Apple Inc., the victim of his crimes; demonstrated

20  sincere remorse and understanding of his wrongdoing; and worked hard to, as he puts

21  it, "earn [his] salvation in this world" though devotion to family and church and a career

22

23  switch that puts service before pecuniary considerations.

24       Perhaps most importantly for Mr. Devine's own future,

25                                   he has participated in therapy in an effort to understand

26  the psychological factors that led to the terrible detour he took in his life.  Mr. Devine

27  has learned that family and economic instability in his childhood left him with a deep

28

fear of financial and personal failure and prone to depression and insecurity.  In 2006 and 2007, Mr. Devine and his wife experienced devastating difficulties carrying a child to term and Mr. Devine experienced setbacks at work.  These upheavals caused Mr. Devine to suffer from an undiagnosed depression, and stimulated the insecurities that Mr. Devine carried with him from his childhood and adolescence.  In this weak emotional state, Mr. Devine was open to the disastrous decision he took to participate in an illegal scheme.  Mr. Devine is working successfully with his therapist to address the emotional damage left by the instability of his early life, and his therapist is confident that he will never again turn to crime.

Based upon ███████████████████████████████████ ███████████, his previously faultless and law-abiding life, the aberrant nature of his offenses, his exceptional acceptance of responsibility and post-offense rehabilitation, ████████████████████████████████████, the dependence of Mr. Devine's young family, and sentences imposed in similar cases, we urge the Court to impose a non-custodial, probationary sentence.

## II.   PERSONAL BACKGROUND

### A.   Childhood and Youth

Mr. Devine was born in Seoul, Korea in 1972 to Sophia Devine (born Yeon Ju Jun) and Kwong Kun Shim.  He was the second child of that union; his older brother, Wop Sup Shim, had been born three years earlier.

Mr. Devine's biological father was unfaithful to Sophia, a heavy drinker, and unable to hold steady employment.  He would fail to come home at night and was frequently gone for days at a time.  Mr. Devine's parents' relationship was defined by

fighting and financial struggle, and Sophia sought a divorce from Kwong Kun Shim

when Mr. Devine was still a young child.  Mr. Devine has had little contact with his

biological father since that time.

Sophia remarried a few years after the initial divorce, and the new marriage gave

Mr. Devine a younger half-brother, Nick Devine (Dong Sup Kim).  Unfortunately,

however, the new marital relationship had many of the same problems as the old.

Sophia's second husband, Hoon Ji Kim, was also a drinker, unfaithful, and unable to

hold steady employment.  The second marriage ended in another divorce in 1984, when

Mr. Devine was twelve years old.

These failed marriages left Mr. Devine's childhood marked by financial struggle.

He recalls his mother's efforts to raise him and his brothers "essentially single-

handedly."  Personal Statement at 1.[1]

> Traditional Korean society frowned on the idea of single motherhood, and
> my mother had to fight to keep her children together through the divorces
> and family upheavals.  She succeeded in this effort, even though she knew
> that providing for the three of us would be an uphill battle as well as
> a tremendous financial burden.  She juggled multiple odd jobs and kept us
> encouraged.

Id.

Although the small family survived and stayed together, its struggles imparted

Mr. Devine with a profound insecurity and sense of shame.  As Mr. Devine's therapist

Dr. Steven Walch states, "Divorce was quite rare and disgraceful in Korea, and Mr.

---

[1] Mr. Devine submitted a personal statement to the probation department, and we
understand that the probation department has provided it to the Court.  This
memorandum will refer to it as the "Personal Statement."  The defense also submitted
to the probation department a report authored by Dr. Steven Walch, who has been
treating Mr. Devine in therapy, and the probation department has likewise provided it to
the Court.  This memorandum will refer to that report as the "Walch Report."

Devine reports feeling deeply ashamed of his mother's divorces and his family's financial instability.  The culturally-unseemly divorces and family instability left Mr. Devine with significant insecurities about his own financial and social status."  Walch Report at 3.  Mr. Devine agrees with this assessment:

> Not having a stable male head of household during my childhood created never-ending financial challenges.  It also created a painful sense of shame in my mind.  We were forced to move from one place to the next in order to avoid debt collectors and property lien holders.  The nomad life style created a significant distraction to my school work and not having a place to call home was a source of emotional stress, anger and depression that still echoes today.

Personal Statement at 1.

Sophia Devine finally found a happy marriage in her third union, with Richard Devine, a United States diplomat.  Although this marriage brought financial stability to Mr. Devine's life, it also precipitated more major upheavals.  As Mr. Devine recounts, "[w]hile we still lived in Korea, my mother's relationship with a foreign man exacerbated my feelings of shame about my family — in a culture where divorces were considered a disgrace, marrying a non-Korean was seen simply an unacceptable and deplorable action."  *Id.* at 2.  Then, in 1986, the family moved from Korea to Switzerland following Richard Devine's reassignment to a post in Bern.  This move was disruptive for obvious reasons, and Mr. Devine felt "extremely foreign," although he sought to view the move as a "new beginning[ ]."  *Id.*  Then, in 1988, when Mr. Devine was sixteen years old, the family made yet another international move, this time settling in Annapolis, Maryland. Despite the alienation of moving to yet another new country, Mr. Devine completed his high school education in Maryland, and quickly became a naturalized U.S. citizen.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.     Education and Career**

Once Mr. Devine and his family settled in the United States, a newfound stability allowed Mr. Devine to succeed academically and later professionally.

"Although the language and cultural barriers were an uphill battle at first, I worked diligently to overcome them.  I came to love my new home and my new country.  I did well in high school, and by my senior year, I had several college admission offers to choose from."  Personal Statement at 3.  Mr. Devine declined an offer to attend Yale, and decided instead to attend the U.S. Merchant Marine Academy, a path that allowed him to "serve [his] adopted country as an Officer in the U.S. Navy."  *Id.*  Mr. Devine's mother describes her pride at this decision: "I knew he felt he owed the United State[s] his time and effort for giving him and his family a chance to pursue an American Dream."  Ex. A (Letter of Sophia Devine).[2]  Mr. Devine graduated with a commission in the U.S. Navy, which he describes as "still one of the proudest achievements in my life." Personal Statement at 3.

After undergraduate school, Mr. Devine received a Masters of Business Administration from Boston University and then a master's degree in Systems Engineering from MIT.  In 1998, after graduating from MIT, Mr. Devine took a job at a Boston-area semi-conductor company called Teradyne.  During his years at Teradyne, he found professional success and received promotions and the responsibility of handling a team in the company's new product development group.

Mr. Devine continued to serve with distinction in the U.S. Navy's active reserve

---

[2] Exhibit A to this memorandum contains letters of support from Mr. Devine's family, friends, colleagues and fellow churchgoers.  The letters are presented alphabetically by author's last name.  Some of the letters were written in Korean; for these letters we have provided the Court with accompanying translations into English.

program during his work at Teradyne.  He was honorably discharged from the service in September 2004.

Also during this time, Mr. Devine met his wife, Jung Hyun, while traveling in Korea.  As Mr. Devine describes, the couple's was a true love story: "My cousin introduced me to Jung Hyun while I was on a trip to Seoul, Korea.  My cousin and Jung Hyun were church friends in Korea and Jung Hyun and I were immediately attracted to each other."  Personal Statement at 4.  Jung Hyun was a graphic designer in Korea, and the pair maintained a long-distance relationship for a period — but they could not remain apart.  Paul and Jung Hyun Devine were married in 2003, and Jung Hyun gave up her career in Korea to move to Massachusetts.

## C. Employment at Apple, Personal and Professional Struggles, and the Context of Mr. Devine's Crimes

In 2005, Mr. Devine took a job at Apple — a position he calls a "great milestone" in his life, which he "took . . . as proof that my hard work and effort had paid off.  Without hesitation, Jung Hyun and I packed up and moved to Sunnyvale, California."  Personal Statement at 4.  Yet shortly after beginning his employment at Apple, Mr. Devine began to struggle.

He and Jung Hyun dearly hoped to start a family, but during 2006 and 2007 Jung Hyun experienced shattering difficulties carrying a baby to term.  The couple had three miscarriages during those years.  Mr. Devine describes how the miscarriages were "devastatingly painful" to him and Jung Hyun, and created "a great deal of stress in [their] lives."  *Id*.  Dr. Walch likewise reports that the miscarriages "left Mr. Devine feeling alienated from Jung Hyun, powerless, and hopeless."  Walch Report at 5. (Happily, these problems were not permanent: the couple's son Juno was born in 2008.)

Meanwhile, Mr. Devine was also experiencing some troubles at work — arguably his first significant career setbacks as an adult.  He noticed that, although he was "giving 100% effort," he was being passed over for promotions and his compensation was lower than that of his colleagues.  "While part of me was extremely pleased just to be at Apple and proud to be a part of a phenomenal business boom, I still felt worried and frustrated."  Personal Statement at 4-5.

As Dr. Walch observes, "Mr. Devine's early history was marked by emotional and financial instability and insecurity.  He coped by excelling academically and athletically, always needing to prove himself.  He also dealt with his demons and insecurities by developing a defensive style ruled by unrealistic, rigid expectations of control and perfection."  Walch Report at 6.  The upheavals Mr. Devine experienced in 2006 and 2007 flouted his need to succeed, caused him to suffer from an undiagnosed depression, and stimulated the insecurities that Mr. Devine carried with him from his childhood and adolescence.  The confluence of these issues left Mr. Devine vulnerable to easy answers and it was in this context that he entered into the illegal scheme that gave rise to the case at bench.

As Mr. Devine describes,

My recent work in therapy has helped me piece together how the financial and emotional instability of my childhood in Korea has plagued me, and left me constantly afraid of failing to provide for my wife and son.  My early life also left me with a strong desire for validation, a desire that was not being fully met in my Apple employment . . . . [I]n my depressed state I agreed to the scheme out of some misguided sense that it would help to meet my need to create financial security for my family and myself — and my desire to feel validated.  And once I had started down the path, it was easy to reach similar arrangements to do favors for other suppliers.

Personal Statement at 5.  Dr. Walch echoes this analysis:

> Mr. Devine's criminal behavior occurred during a time when he was not
> succeeding, either at work or at conceiving a child. His unrecognized
> depression arising from his frustrations at work and the emotional turmoil
> involved in his young family's fertility struggles played on his long-standing
> insecurities about financial and personal success, and left him open to
> accepting his first bribe. The money Mr. Devine received through his
> misconduct appears to have assuaged his deeply-felt need to provide his
> family with financial security he lacked as a child . . . and Mr. Devine's
> relationships with co-conspirators satisfied in some manner his desire to
> prove himself and gain social status. That an otherwise intelligent,
> successful and law-abiding man would fall into this course of conduct was
> a sign of the long-standing, undiagnosed depression and insecurity that
> plagued Mr. Devine.

Walch Report at 7.

Mr. Devine's misguided and out-of-character attempt to appease his unexamined psychological needs led to one of the oddest features in this case:  Mr. Devine received large amounts of money from his misconduct, yet he spent almost none of it.[3]  Instead, Mr. Devine stuffed his cupboards and bank safety-deposit boxes with wads of cash, or left funds to languish in bank accounts. He was not seeking a lavish lifestyle, but rather seeking — in an ineffective, unexamined and ill-advised manner — to meet his deep desires for validation and for financial security for his family.

Mr. Devine's participation in the illegal scheme lasted for several years.  He felt trapped by the errant path he had followed.  As Mr. Devine describes, "I never imagined that the amount of money I made from bribes would grow so large . . . . The irony was

---

[3] As the PSR reports, the government suggests that Mr. Devine spent some ill-gotten funds on a used Porshe in February 2007.  PSR ¶ 48.  Mr. Devine recalls that the funds for the purchase in fact derived from the sale of stock he had earned through the regular course of his legitimate employment.  This recollection is supported by the evidence in this matter, which does not show any illegal payments to Mr. Devine on or before November 13, 2006, when he bought the supposedly suspicious travelers checks he subsequently used to pay part of the down payment for the car.  *See* PSR ¶ 48.  In any event, however, this dispute between the parties has little import: Mr. Devine has consented to forfeiture of the vehicle as part of his effort to compensate Apple for the losses he caused.  *See* Plea Agreement ¶ 8(c)(f).

that the accumulation of money created an unbelievable amount of insecurity and anxiety for me . . . . I was paralyzed by my illegal activities and I was completely afraid that the situation was getting out of control." Personal Statement at 5. Dr. Walch likewise reports that "Mr. Devine felt trapped by the momentum of his criminal behavior and by the rewards . . . ." Walch Report at 7.

### D.   Arrest

In August 2010, Mr. Devine was arrested and charged in the case that brings him before the Court. As we will address in more detail below, Mr. Devine took his arrest as an opportunity to leave his "terrible detour," Personal Statement at 5, behind. ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ Mr. Devine has changed his career, entered therapy, devoted himself to his church, and sought for four years to make amends for his wrongdoing ████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████.

## III.   THE OFFENSE CONDUCT

From 2007 to 2010, Mr. Devine engaged in a scheme pursuant to which he transmitted confidential Apple information to suppliers and manufacturers of Apple parts, including his co-defendant Andrew Ang and others. In return, the suppliers and manufacturers paid Mr. Devine kickbacks, which he shared with Ang.

Mr. Devine was approached about joining in the kickback scheme by Jacky Chua, the founder and former managing director of Jin Li Mould Manufacturing, an

Apple supplier.  Andrew Ang, Chua's employee and relative by marriage, became Mr. Devine's contact person.  Ang also organized similar arrangements between Mr. Devine and other suppliers.

Mr. Devine pled guilty to count one of the indictment, which charges him with engaging in a wire fraud scheme to deprive Apple of its right to honest services under 18  U.S.C. §§ 1343 and 1346; count sixteen of the indictment, which charges him with entering into a wire fraud conspiracy with Ang in violation of 18 U.S.C. §§ 1343 and 1349; count seventeen of the indictment, which charges him with money laundering in violation of 18 U.S.C. § 1956; and count twenty-three of the indictment, which charges him with engaging in monetary transactions with criminally-derived property in violation of 18 U.S.C. § 1957.

Mr. Devine knows that his actions were wrong and betrayed the trust of his employer and many others.  He has fully accepted responsibility for his actions.  *See* PSR ¶ 52; Plea Agreement ¶¶ 1 & 2; Ex. A (various support letters).  In Mr. Devine's own words:

> Regardless of the reasons for my vulnerability to committing these transgressions, I know there is no excuse for my crimes and am truly sorry.  I am sorry for what I have done, and I am sorry to those who trusted me and suffered due to my offense.  I know I will never again depart from the morals I learned from my mother, and hope also to instill in my young son.

Personal Statement at 6.



**V.    ARGUMENT**

In light of ████████████████████████████████████████████

████████, the aberrant nature of his misconduct, his post-offense rehabilitation, his

unusual efforts to make financial restitution, other sentences in closely analogous

cases, and other factors, we will ask that the Court impose a non-custodial sentence in

this case.

**A.    The Sentencing Guidelines**

Mr. Devine has agreed with the government that the U.S. Sentencing Guidelines,

as applied in his case, yield an adjusted offense level of 24.  *See* Plea Agreement ¶ 7.

The probation department concurs with this calculation.  PSR ¶ 65.

**B.     18 U.S.C. § 3553 Factors**

The U.S. Sentencing Guidelines are advisory and establish only a "starting point" for the district court's sentencing determination.  *Gall v. United States*, 552 U.S. 38, 57 (2007); *accord Cunningham v. California*, 549 U.S. 270, 286-87 (2007).  District courts must consider the Guidelines, but should "tailor the sentence in light of other statutory concerns, as well."  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  Specifically, courts must determine the appropriate sentence by considering all of the factors set forth in 18 U.S.C. § 3553(a).  *Gall*, 552 U.S. at 49-50.

Section 3553(a) makes clear that the appropriate sentence is one that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2" of Section 3553(a).  These purposes include: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense; the need for the sentence imposed to protect the public from further crimes of the defendant; and the kinds of sentences available.  18 U.S.C. § 3553(a)(2).

The probation department has recognized that, even apart from a potential § 5K1 motion, the § 3553 factors warrant a below-guidelines sentence.  *See* PSR Sentencing Recommendation.  The defense agrees, and submits that numerous significant factors apply in this case under § 3553(a).

1.     The Aberrant Nature of Mr. Devine's Misconduct

Although Mr. Devine's misconduct continued over the course of several years, there can be little doubt that it was nonetheless an aberrant detour — one that he will

never repeat.  As the probation officer acknowledges, this factor militates in favor of a less-severe sentence than called for by the Guidelines.  PSR Sentencing Recommendation at 3.

Mr. Devine's life up until 2006 was a story of success in the face of difficult beginnings.  After his life stabilized upon his family's move to the United States, he earned an undergraduate and multiple graduate degrees, served this country with distinction in the armed forces, and succeeded in his early career.  As Dr. Walch attests, "[i]t would appear that up to the point of his crimes, Mr. Devine had deserved the respect, status, and trust his employers had for him and that, indeed, his criminal activities were out of character."  Walch Report at 6.

Mr. Devine started down his misguided path in 2006 and 2007, when "[h]is unrecognized depression arising from his frustrations at work and the emotional turmoil involved in his young family's fertility struggles played on his long-standing insecurities about financial and personal success, and left him open to accepting his first bribe."  *Id.* at 7.  Mr. Devine's detour was difficult to correct once taken:  "Mr. Devine felt trapped by the momentum of his criminal behavior and by the rewards."  *Id.*  But his arrest finally broke the momentum, and his life is back on track:

> He is sincerely remorseful and ashamed of the suffering he has caused others and his family.  He has struggled since his arrest to acknowledge his wrongdoing, to redefine himself, and to help young students in need. [¶]  In addition, he began psychological treatment.  Mr. Devine has remained focused and motivated throughout his sessions.  He is learning more about his motivations, attempting to alter dysfunctional intrapersonal and interpersonal patterns and come to terms with historical issues.

*Id.* at 7.  "That an otherwise intelligent, successful and law-abiding man would fall into this course of conduct was a sign of the long-standing, undiagnosed depression and

insecurity that plagued Mr. Devine." *Id.*  In short, Dr. Walch reports that Mr. Devine "poses a very low risk to repeat crimes and that with further treatment he can expect a return to his usual high level of responsible, law-abiding behavior." *Id.* at 8.

Mr. Devine's own statement similarly reveals a man whose crimes were a true aberration, and who will never make such mistakes again.  He writes:

> The four years since my arrest have been a grueling lesson in humility, responsibility and remorse.  I feel a great deal of guilt and shame, and I recognize fully what have done.  But I also realize that I must continue to try to make things right.  I have tried to make amends ██████████████████ ██████████████████████████ . . . . Although the guilt and shame continue to fester and eat away at my conscience, I am working every day to earn my salvation in this world.

Personal Statement at 6-7.

The many letters from Mr. Devine's family, friends and colleagues also reveal how out of character was Mr. Devine's crime, and how hard he has worked to take ownership of his misconduct and improve himself for the future.  The letters uniformly describe a kind man[4] who is devoted to his wife and young son, deeply involved with his church, and always ready to lend a hand to a friend in need.  Although the letter writers are of course shocked at the wrong turn Mr. Devine took in his life — *see, e.g.,* Ex. A (Letter of Young Lee: "When I learned about the crime he committed, I was shocked since it did not match with the person who he is") — they present a man who has not wallowed in his downfall.

As Mr. Devine's mother Sophia attests, Mr. Devine

> was always a model student in school and he is a great brother to his siblings.  Of course, he has brought so much joy, love and care to my life

---

[4] A remarkable number of the more than ninety supporters who wrote to this Court described Mr. Devine's kindness in their letters.

[¶] . . . . As a mother, it is impossible to express how painful it was to watch his fall . . . . But I am proud that he has been truly remorseful for what he has done and has been working diligently to redeem himself as a son, a husband, and a father.

Ex. A (Letter of Sophia Devine).  Mr. Devine's wife Jung Hyun also writes of his efforts at redemption: "Paul has never lost his hope and has continued to strive to stand strong and be a good father to our son while deeply regretting his mistakes.  [¶] . . . . Paul is everything to our son Juno.  Juno looks up to his dad and sees the best dad there could possibly be in the world."  Ex. A (Letter of Jung Hyun Devine).  And Mr. Devine's brother Nick writes that "Paul is a great father, a true family man, and a friend you can count on. I see how he cares for his son and it reminds me of how he guided me through so many of life's ups and downs when we were growing up.  Always patient, always respectful, always kind."  Ex. A (Letter of Nick Devine).

Many of the congregants at Mr. Devine's church have also written to the Court. These people are impressed with Mr. Devine's character, and his efforts to straightforwardly reckon with his own misconduct.  We will not seek to reproduce all of the many testaments to Mr. Devine's atonement, but quote one representative churchgoer:

Paul is in deep regret of his misdeeds and has shown deep remorse as he waits for his sentencing.  That is what pushed me to write this letter to you to share the Paul I have known for the past 4 years.  Paul helps teenagers who need guidance in planning for college and careers, offering advice so they can draw a roadmap for their future and build their dreams and visions.  He is hardworking, proactive and kind and friendly to whoever he meets.  He is one of the most volunteers at church, making sacrifices of his own to serve others.  Although his own family is faced with difficulties, he never turns a blind eye to those who are in tougher conditions and helps them . . . .

Ex. A (Letter of Ji Jun He).

The arc of Mr. Devine's life demonstrates that there is little "likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b)(1). These factors support a downward variance. *See United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) (re-offense unlikely); *United States v. Stall*, 81 F.3d 276, 279 (6th Cir. 2009) (court found defendant less likely to re-offend than typical defendant).

### 2. Post-Offense Rehabilitation

Relatedly, Mr. Devine has demonstrated exceptional post-offense rehabilitation. The United States Supreme Court has recognized that post-offense rehabilitation "may, in appropriate cases, support a downward variance from the now-advisory Federal Sentencing Guidelines range." *Pepper v. United States*, __ U.S. __, 131 S. Ct. 1229, 1236 (2011) (considering post-sentencing rehabilitation). The *Pepper* Court observed that

> evidence of . . . rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing. For example, evidence of . . . rehabilitation may plainly be relevant to "the history and characteristics of the defendant." § 3553(a)(1). Such evidence may also be pertinent to "the need for the sentence imposed" to serve the general purposes of sentencing set forth in § 3553(a)(2) — in particular, to "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training . . . or other correctional treatment in the most effective manner." §§ 3553(a)(2)(B)-(D); [citation] . . . . [R]ehabilitation may also critically inform a sentencing judge's overarching duty under § 3553(a) to "impose a sentence sufficient, but not greater than necessary" to comply with the sentencing purposes set forth in § 3553(a)(2).

131 S. Ct. at 1242. Although the *Pepper* Court's holding related to post-sentencing rehabilitation, the principles upon which the Court relied plainly apply as well in the context of post-offense, pre-sentencing rehabilitation. *See, e.g., United States v. Robertson*, 662 F.3d 871, 878 (7th Cir. 2011); *United States v. Stewart*, No. 8:09CR282,

2011 U.S. Dist. LEXIS 89767 at *6-8 (D. Neb. Aug. 11, 2011); s*ee also United States v. Shy*, 538 F.3d 933, 938 (8th Cir. 2008) (affirming a variance to probation for extraordinary post-arrest rehabilitation, noting that rehabilitation was genuine and the defendant was a positive contributor to society).  The Court should consider the following facts that demonstrate Mr. Devine's robust post-offense rehabilitation.

 

Second, Mr. Devine has made every effort to make financial restitution to Apple. These efforts have been unusual, to say the least.  As part of his plea agreement, Mr. Devine agreed to pay to Apple the funds he garnered during his criminal activity, including by importing foreign funds to post as bail, where the funds are being preserved until judgment is entered and they made satisfy Mr. Devine's restitution obligations.  *See* Plea Agreement ¶ 8(c)(l); Docket #16 (release order).  As previously discussed, the funds are available to serve as restitution because Mr. Devine spent almost none of his ill-gotten gains.

1

2

3

4

      Third, Mr. Devine has demonstrated true contrition.  As discussed throughout

this memorandum and in the many letters of support we have presented to the Court,

Mr. Devine unquestionably understands his wrongdoing and is committed to, as he puts

it, earning his "salvation in this world."  Personal Statement at 7.  As a fellow churchgoer

writes, the church community has "seen a changed man who has learned from his

mistake and has made efforts to use his experience to change and shape the lives of

others for the better."  Ex. A (Letter of Steven Lim).

      Fourth, Mr. Devine has embarked on a new career path.  In his new, post-arrest

career, he works with "underprivileged and at-risk teenagers . . . to mentor them to help

find a path to a college education."  Personal Statement at 6.  Impressively, Mr. Devine

seeks to be open with these students about his crimes, despite the embarrassment:

> During my sessions with students, I talk about my past and my crimes so
> that they recognize the importance of education but also understand the
> legal and ethical responsibilities of life.  I simply do not want anyone else
> to make the same mistakes I have made.  Although it is difficult and
> shameful to talk about my crimes in front of people, I realized that my
> confession can prevent others from unethical and illegal behaviors.  It is
> part of my efforts to make amends for what I have done wrong.

*Id.* at 6.  This counseling is not just a vocation — a review of the attached letters of

support reveals that Mr. Devine has undertaken to provide guidance to many high

school students outside of work, too.  The members of Mr. Devine's church report that

> [h]e has organized and conducted over 30 seminars for struggling high
> school juniors and seniors to prepare . . . them for college over the last
> few years.  He spend[s] his evenings and weekends to help troubled
> students with college application processes, explain the differences in

majors, and work[s] with them on their college interview skills.

Ex. A (Letter of Elizabeth Sanchez, relaying the gratitude of students who attended the seminars); *see also, e.g.,* Ex. A (Letter of Daniel Tran, a current college student describing Mr. Devine's efforts to encourage him: "[H]e showed me some college programs that I can apply.  I was not confident about college.  But Mr. Devine seemed to have zero doubt.  It was the first time I felt like someone was interested in my future.  It certainly was the first time I was encouraged to attend college and think about my own future."); Ex. A (Letter of Laura Chu, describing Mr. Devine's mentoring in East San Jose).

Fifth, as many of the letters included in Exhibit A attest, Mr. Devine has thrown himself into his church and its community.  It is plain from those letters that Mr. Devine has demonstrated sincere remorse to the members of the church community, and has not sought to hide from his misdeeds.  He is truly a valued and selfless contributor to the church community.

Sixth, Mr. Devine, ███████████████████████████ began therapy with Dr. Walch in order to address the underlying, undiagnosed psychological stresses that led to his misconduct.  Dr. Walch reports that he is pleased by Mr. Devine's progress: "Mr. Devine has remained focused and motivated throughout his sessions.  He is learning more about his motivations, attempting to alter dysfunctional intrapersonal and interpersonal patterns and come to terms with historical issues."  Walch Report at 7-8.  Again, this hard work will ensure that Mr. Devine will never again stray into illegal conduct.

All of these factors suggest that Mr. Devine has worked unusually hard to make

amends and to rehabilitate himself.

### 3.    Agreement to Restitution and Financial Factors

As discussed, in connection with his plea Mr. Devine agreed that certain asserts could be used for restitution to Apple (or forfeiture if no restitution order is made).  Plea Agreement ¶ 8.  At the time of its seizure, the JP Morgan Chase brokerage account referenced in paragraph 8(c)(k) of the plea agreement was valued at $702,978.86, bringing to $2,226,937.61 (plus a used car) the total assets subject to the agreement in the plea agreement.

These financial circumstances are relevant to the Court's sentencing decision for several reasons.  First, when a defendant like Mr. Devine suffers harsh collateral

1   consequences from a conviction, the Court may take account of those already-occurring

2   punishments in fashioning a sufficient sentence.  *See, e.g., United States v. Samaras*,

3   390 F. Supp. 2d 805, 809 (E.D. Wis. 2005).  Second, a defendant's unusual efforts to

4   make restitution reflect on the defendant's acceptance of responsibility, and thus his

5   "characteristics" under 18 U.S.C. § 3553(a)(1).  *See, e.g., United States v. Kim*, 364

6   F.3d 1235, 1240-41 (11th Cir. 2004) (pre-*Booker* case considering unusual restitution

7   as a basis for a downward departure from the Guideline sentence).  Third, § 3553(a)(7)

8   directs the Court to consider, in fashioning a sentence, "the need to provide restitution

9   to any victims of the offense" — and a custodial sentence, of course, would make it

10  more difficult for Mr. Devine to begin his efforts to meet his restitution obligations.

11              4.      Family's Dependence

12      A defendant's "family responsibilities" are "an aspect of the defendant's 'history

13  and characteristics,'" and are therefore a relevant consideration under 18 U.S.C.

14  § 3553(a)(1).  *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006), *as

15  amended on pet'n for reh'g*, *overruled on other grounds as stated in United States v.

16  Munoz-Camarena*, 621 F.3d 967, 969-70 (9th Cir. 2010) (per curiam).  As the probation

17  officer recognizes, Mr. Devine is his family's primary breadwinner and his family's

18  dependence is a consideration warranting a below-guidelines sentence.  *See* PSR

19  Sentencing Recommendation at 3. ██████████████████████████

20  ███████████████████████████ a sentence that prevented Mr. Devine from

21  working would have devastating financial impact on Jung Hyun and Juno.  Of course, it

22  would have a horrendous emotional impact, as well.  The letters attached in Exhibit A

23  make clear how close Juno is to his father, and how difficult a custodial sentence would

1   be for the family.

2              5.      Proportionality in Sentencing

3         Finally, the "need to avoid unwarranted sentence disparities among defendants

4   with similar records who have been found guilty of similar conduct," 18 U.S.C.

5   § 3553(a)(6), militates strongly in favor of a less-substantial sentence than suggested by

6   the Guidelines.

7

8

9

10  

11

12

13

14

15

16

17        Likewise, in a very similar recent case proceeding before Judge Claudia Wilkin,

18  *United States v. Ghazvini et al.*, No. 12-CR-00660 (CW), Hamid Ghazvini pled guilty to

19  conspiring to provide his employer's confidential information to potential suppliers in

20  exchange for kickbacks.  *See, e.g., Ghazvini* Docket #171 at 3.  At least one co-

21  defendant cooperated against Mr. Ghazvini, *Ghazvini* Docket #201 at 1-2, and the court

22  determined that Mr. Ghazvini had caused a loss of more than $1.7 million, *Ghazvini*

23  Docket #180 at 5.  Mr. Ghazvini received a sentence of six months imprisonment, and

24  the cooperating defendant received a straight probationary term.  *Ghazvini* Docket #180

25  at 2; # 227 at 2.

26        The probation department observes that Mr. Ghazvini, unlike Mr. Devine, "only

27

28

pled guilty to one count of Conspiracy to Commit Wire Fraud; and did not have increases to the guideline calculations for a conviction of Money Laundering, or for sophisticated laundering, which resulted in Mr. Devine having a higher Total Offense Level." PSR Sentencing Recommendation at 3. But 18 U.S.C. § 3553(a)(6) calls for sentencing parity among defendants who have engaged in "similar conduct." While there were slight differences between Mr. Ghazvini's plea agreement and Mr. Devine's, Mr. Ghazvini unquestionably engaged in conduct very similar to Mr. Devine's, and accordingly his guideline calculation was quite similar to Mr. Devine's: a Total Offense Level of 22 with a recommended imprisonment range of 41-51 months. ████████ ████████████████████████████████████████████████████████████, his sentence included just six months imprisonment (with an additional six months in a Residential Re-Entry Center). Mr. Devine's punishment should not be harsher.

Under § 3553(a)(6), the Court should fashion a sentence for Mr. Devine that takes account of the results in these similar cases.

## VI.    CONCLUSION

For all of the reasons stated above, we submit that a non-custodial sentence that permits Mr. Devine to continue to work would be "sufficient, but not greater than necessary." § 3553(a). We suggest that the Court impose a probationary term that includes a period of home confinement.

We agree with the assessment of the probation department that Mr. Devine does not have the ability to pay a fine within the guideline range and that the Court should not impose one. *See* PSR ¶ 113, Sentencing Recommendation at 4. Given Mr. Devine's financial circumstances, the financial payments he has already made, and ████████████

████████████████████████████████, no additional fine is necessary or appropriate.[5]

In his plea agreement, Mr. Devine consented to relinquish specified assets — including assets held by the Court as bail — and the parties agreed that those assets would be used first to satisfy Mr. Devine's restitution obligations and then, if any portion remained, that remaining portion would be forfeited to the United States.  Plea Agreement ¶ 8.  We ask that the Court impose an order effectuating the parties' agreement.

Finally, ███████████████████████████████████████████

███████████████████

Dated: November 24, 2014

Respectfully submitted,                    ARGUEDAS, CASSMAN & HEADLEY, LLP


                                           By: _____/s/_____
                                           Raphael M. Goldman
                                           803 Hearst Avenue
                                           Berkeley, CA 94710
                                           (510) 845-3000

                                           *Counsel for Paul S. Devine*

---

[5] In light of Mr. Devine's financial circumstances and ███████████████████
████████████████████████████████, imposing a fine would "impair the ability of the defendant to make restitution" under 18 U.S.C. § 3572(b).